792 F.2d 1269
 MAJOR MEDIA OF THE SOUTHEAST, INC., d/b/a Naegele Outdoor
Advertising Company of Raleigh-Durham, Appellant,
v.
CITY OF RALEIGH, Appellee.
Outdoor Advertising Assoc. of America, Inc., Amicus Curiae.
 No. 85-2093.
 United States Court of Appeals,
Fourth Circuit.
 Argued April 7, 1986.
Decided June 12, 1986.
 
 McNeill Smith (Richard W. Ellis, Smith, Helms, Mullis & Moore, Greensboro, N.C., on brief), for appellant.
 Thomas A. McCormick, Jr., City Atty., Raleigh, N.C., on brief, for appellee.
 (Eric M. Rubin, Walter E. Diercks, Rubin, Winston & Diercks, Washington, D.C., on brief), for amicus curiae.
 Before MURNAGHAN and WILKINSON, Circuit Judges, and BUTZNER, Senior Circuit Judge.
 MURNAGHAN, Circuit Judge:
 
 I.
 
 1
 Major Media of the Southeast, Inc., doing business as Naegele Outdoor Advertising Company ("Naegele") appeals from an order granting summary judgment in favor of the City of Raleigh, North Carolina ("City" or "Raleigh"), 621 F.Supp. 1446. Naegele brought an action against the City to have Ordinance No. (1983) 210 TC 198, adopted October 18, 1983 ("October 1983 ordinance"), entitled "An Ordinance Regulating the Placement, Area, and Height of Outdoor Advertising Signs," declared unconstitutional. Naegele, a Delaware corporation, does business in the Raleigh-Durham area erecting billboards on property which it owns or leases. Naegele sought a declaratory judgment that the October, 1983 ordinance was invalid because it operated as a taking of property, as an arbitrary and unreasonable exercise of the City's police power, as an abridgement of Naegele and Naegele's customers' first (and fourteenth) amendment rights, for being vague and overbroad, and for denying Naegele due process of the laws.
 
 
 2
 The October 1983 ordinance amended a 1979 City ordinance which established zoning regulations for signs in the City. The 1979 ordinance allowed "on-premise" signs, defined as signs located on the premises which "direct[ ] attention to a business, profession, commodity, service, or entertainment conducted, offered, sold, manufactured, or provided at a location on the premises where the sign is located or to which it is affixed," and permitted "off-premise" signs (or "non-point-of-sale" signs) and special category signs, including political signs, real estate signs and governmental and public purpose signs, in certain areas of the City.
 
 
 3
 The October 1983 ordinance modified the 1979 ordinance by severely restricting the size of off-premise signs to 150 square feet facing four-lane streets, or 75 square feet facing two-lane streets, and confining their location to industrial zones, as defined in the ordinance. On-premise signs were not affected. The October 1983 ordinance enacted further provisions forbidding the replacement, renewal or relocation of existing off-premise signs made non-conforming by its terms. Existing non-conforming signs were given a grace period, but had to be removed within 5 1/2 years from October 23, 1983, unless they fell within certain exceptions as established by state law, e.g., they were located adjacent to highways on the National System of Interstate and Defense Highways or on the Federal-Aid Primary Highway system. The 5 1/2 year grace period (sometimes referred to as an "amortization" period) was granted owners of non-conforming signs in lieu of any other form of compensation.
 
 
 4
 Existing on-premise signs were grandfathered in under the October, 1983 ordinance, but if their contents were changed, they had to be brought into compliance with the provisions of the ordinance relating to on-premise signs, e.g., size requirements and grants of permission for erection from the relevant City authorities. The only on-premise signs allowed were those which "direct[ed] attention to a business, profession, commodity, attraction [etc.] ... sold [etc.] ... at a location on the premises where the sign is located or to which it is affixed." It was stipulated by both parties that it was the policy of the City "to deny a permit for an on-premise sign that does not conform to the City Code, in that the sign does not advertise the business, etc., at the location of the sign."
 
 
 5
 Evidence was presented before the district court to show that Naegele owned 350 of the 485 billboards in the city. Of Naegele's 350 billboards, 170 were located near highways and were exempted from the 1983 ordinance. All but six of the remaining 180 of Naegele's billboards were larger than 150 square feet and were made non-conforming by the ordinance. It was stipulated that Naegele made space on those billboards "available to 'all comers' " and that in the past a wide variety of commercial and non-commercial organizations and businesses, including political groups, charities, the Peace Corps, wildlife recreation groups, and the U.S. Olympic Committee had advertised on Naegele's billboards.
 
 
 6
 The original version of what became the October 1983 ordinance, as proposed, included a provision which stated that "[n]othing in this ordinance or in Section 10-2065 of the Raleigh City Code shall apply to non-commercial signs." The language was proposed because it was recognized that there might be "significant legal problems" if the ordinance was construed to favor commercial over non-commercial speech. See Metromedia, Inc. v. San Diego, 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981).
 
 
 7
 The proposed section excepting non-commercial speech from the scope of the ordinance's restrictions, however, was not included in the ordinance as initially passed. Naegele moved for summary judgment on December 3, 1984 on the grounds that the ordinance as passed was unconstitutional.[1] On December 4, 1984, the omission of the provision relating to non-commercial speech was brought to the attention of the Raleigh City Council; the Council met and enacted Ordinance 450 TC 228, which amended the October 1983 ordinance to include a provision which stated that "[a]ny sign authorized in this chapter is allowed to contain non-commercial copy in lieu of any other copy." The ordinance does not define "commercial" or "non-commercial" copy.[2]
 
 
 8
 Under the procedures specified by the Ordinance, if a sign (whether non-commercial or commercial) is to be erected, a permit must be requested and the copy or contents of the proposed sign display must be submitted to the relevant authorities. An inspector will then examine the application, classify the sign on the basis of its contents, and grant or deny the permit, depending on whether the sign is a permissible one for the zone where it is to be located. If a sign is proposed for an area where neither on-premise nor off-premise signs are allowed, the inspector must determine whether the copy is commercial or non-commercial. If it is non-commercial, it should automatically be allowed.[3] Because no occasion has arisen for an inspector to make such a determination, any potential abuse of these procedures must await whatever challenge, if any, may be made at a later date.
 
 
 9
 After the ordinance was modified to except non-commercial signs from regulation by the City, Naegele renewed its motion for summary judgment before the district court. The City also moved for summary judgment. On October 16, 1985 the district court entered an order granting summary judgment in favor of the City. Naegele had contended before the court that the ordinance was vague, standardless and a content-based infringement of its first amendment rights and that it gave the City unguided enforcement discretion, exceeding legitimate police power. Naegele also contended that the ordinance, as modified, preferred commercial over non-commercial speech in violation of Metromedia, supra.
 
 
 10
 The district court, in granting summary judgment in favor of the City, denied Naegele's contentions, and found that the Ordinance as modified did not offend Metromedia nor was it vague and standardless. The court determined that Naegele had not shown that there were any material questions of fact relating to the propriety of the City's justification for the Ordinance on safety and aesthetic grounds. The court also found that Naegele's contention that the 5 1/2 year amortization or grace period violated the taking clause of the Fifth Amendment (made applicable through the Fourteenth Amendment) was baseless. The court held that under the North Carolina law such an amortization period was valid if it were reasonable and amounted to just compensation. State v. Joyner, 286 N.C. 366, 375, 211 S.E.2d 320, 325 (1975), appeal dismissed, 422 U.S. 1002, 95 S.Ct. 2618, 45 L.Ed.2d 666 (1975). The district court held that the reasonableness of an amortization period was an appropriate matter for summary judgment determination. See R.O. Givens, Inc. v. Town of Nags Head, 58 N.C.App. 697, 294 S.E.2d 388 (1982), cert. denied and appeal dism'd, 307 N.C. 127, 297 S.E.2d 400 (1982). Under North Carolina law, the amortization period specified in the October 1983 Ordinance was reasonable.
 
 II.
 
 11
 The Supreme Court having determined in Metromedia, supra, that a city may justifiably prohibit all off-premise signs or billboards for aesthetic and safety reasons, our discussion of Naegele's challenge to the Raleigh ordinance will be brief. The element of the San Diego sign ordinance found offensive to the First Amendment in Metromedia--the preference of commercial over non-commercial speech--was removed by the amendment passed by the Raleigh City Council on December 4, 1984. Whatever the effect of the ordinance before amendment, the ordinance now in effect does not run afoul of the First Amendment since it does not treat commercial speech more favorably. Because Raleigh's justifications for its ordinance are virtually the same as those enunciated by San Diego in Metromedia, supra, 453 U.S. at 509-510, 101 S.Ct. at 2893, we also find, as in Metromedia, that the ordinance does not impermissibly burden commercial speech.
 
 III.
 
 12
 Naegele next contends that the ordinance is vague and contains no standard for guidance as to prohibited and allowable conduct. Grayned v. City of Rockford, 408 U.S. 104, 108-109, 92 S.Ct. 2294, 2298-2299, 33 L.Ed.2d 222 (1972). We cannot agree. Although the ordinance provides no definition of "commercial" or "non-commercial" speech, sufficient guidance is given for such determination by City officials by the various decisions of the Court relating to billboards and commercial speech. We agree with the district court that "no codification of these terms is necessary, since the Supreme Court has already defined them." See Central Hudson Gas & Elec. v. Public Service Comm'n., 447 U.S., 557, 561, 100 S.Ct. 2343, 2348, 65 L.Ed.2d 341 (1980). In Central Hudson Gas, the Court stated that commercial speech was "expression related solely to the economic interests of the speaker and its audience." Although an occasional marginal case might arise raising the question of whether on the particular facts the definition of commercial speech would be correct, such an infrequent possibility should not in itself justify a generalized charge that the ordinance itself is vague, given the guidance afforded by court decisions in the area.
 
 IV.
 
 13
 Naegele next contends that the Raleigh ordinance, even as amended in December 1984 to remove non-commercial speech from the purview of its regulations, still is written in such a way as to prefer commercial over non-commercial speech in violation of Metromedia. Naegele predicts that the owners of the property on which "on premise" signs are placed will not allow placement of signs on their property or premises which contain non-commercial copy. Even if the contention should prove to be true, it derives from decisions of the individual property owners. It has nothing to do with the Raleigh ordinance, itself, which by its very terms does not affect non-commercial signs. The owners of such premises are free to place or to refrain from placing the non-commercial messages of others on their premises. See Pacific Gas and Electric Co. v. P.U.C. of California, --- U.S. ----, 106 S.Ct. 903, 910-911, 89 L.Ed.2d 1 (1986).
 
 
 14
 As we have previously ruled, the relevant ordinance for consideration here is that which includes the December 1984 amendment, not the October 1983 ordinance which inadvertently omitted the provision excepting non-commercial signs. It is implausible indeed that an ordinance containing restrictions amended to exclude non-commercial speech altogether from the ambit of the ordinance can be said to burden such speech.
 
 V.
 
 15
 The Raleigh ordinance's 5 1/2 year "amortization" period, perhaps more correctly called a grace period, allowing non-conforming signs to remain for 5 1/2 years, is a familiar procedure in zoning cases like the present one. The period allowed by the City gave the owners of non-conforming signs a time in which their non-conforming use could continue and further allowed them a period during which they could recoup their investment. Such a course allows for a "middle ground" between summary termination of a non-conforming use and indefinite continuance of such a use. Joyner, supra, 286 N.C. 372-73, 211 S.E.2d at 324, citing 1 Anderson, American Law of Zoning, Sec. 6.65, 446-47 (1968). Such amortization provisions have generally been held by courts not to necessitate additional compensation, if they are " 'reasonable in the light of the nature of the business of the property owner, the improvements erected on the land, the character of the neighborhood, and the detriment caused the property owner.' " Id. 286 N.C. at 374, 211 S.E.2d at 325, quoting Harbison v. Buffalo, 4 N.Y.2d 553, 562-63, 176 N.Y.S.2d 598, 605, 152 N.E.2d 42, 47 (1958). The North Carolina Supreme Court held in Joyner that such an amortization provision was not per se unconstitutional which allowed only three years for removal of a non-conforming use. Id.
 
 
 16
 The district court also overruled Naegele's objection that determination of the reasonableness of such a provision was inappropriate for summary judgment. The district court noted that the factors which must be considered in order to determine the reasonableness of the grace period "include the length of the period and whether the public gain achieved outweighs the private loss suffered by owners of the non-conforming uses." See Modjestea Sign Studios, Inc. v. Berle, 43 N.Y.2d 468, 402 N.Y.S.2d 359, 373 N.E.2d 255 (1977), appeal dism'd, 439 U.S. 809, 99 S.Ct. 66, 58 L.Ed.2d 101 (1978). As the district court observed, other courts have held that shorter "amortization" periods were "reasonable." Several courts have made such determinations on summary judgment. In R.O. Givens, Inc. v. Town of Nags Head, 58 N.C.App. at 702, 294 N.E.2d at 391, the North Carolina Court of Appeals found a 5 1/2 year amortization period reasonable in light of Joyner. It was stated that the sign owners were not allowed to amend their complaint and that they were appealing from that order indicating the issue was one of law, ripe for decision rather than one of fact. Id. 294 N.E.2d at 390.
 
 
 17
 The second case cited by the district court as deciding the issue of reasonableness of amortization on summary judgment is Donrey Communications Co. v. City of Fayetteville, 280 Ark. 408, 660 S.W.2d 900 (1983), cert. denied, 466 U.S. 959, 104 S.Ct. 2172, 80 L.Ed.2d 555 (1984). In Donrey, the Arkansas Supreme Court affirmed a lower court's determination on summary judgment that a four year amortization period was reasonable.
 
 
 18
 While the theoretical principle cannot be said to vet 5 1/2 years in any and all cases (we do not purport to hold that the owner of a sign can invariably recoup its investment in such a time span), nevertheless, in the present case, Naegele has not presented sufficient evidence to create a triable issue of fact on whether the period here was so unreasonable that it constituted a "taking" of Naegele's property.
 
 
 19
 The order of the district court is, accordingly,
 
 
 20
 AFFIRMED.
 
 
 
 [1]
 In fact the parties stipulated on December 3, 1984 that "[u]nder the Raleigh City Code in effect on the date of this stipulation, as contained in Exhibit A, an on-premise sign can contain copy solely relating to the business, etc. conducted on the premise where the sign is, but the use of otherwise identical on-premise signs to carry other messages is generally prohibited."
 
 
 [2]
 The district court found that the amendment was passed by the defendant "to eliminate any potential constitutionality problems." Although the amendment is not free from potential ambiguity, it seems to allow non-commercial copy to be placed on any on-premise sign (or any permitted off-premise sign) instead of commercial copy
 
 
 [3]
 Although both parties have argued this is the effect of the ordinance, it might also be read to exclude off-premise signs entirely in some areas, regardless of their contents